IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSHUA L. STEWART | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 21-cv-458 |
| | ) | |
| v. | ) | District Judge William S. Stickman |
| | ) | Magistrate Judge Maureen P. Kelly |
| KEVIN KAUFFMAN; | ) | |
| THE ATTORNEY GENERAL OF THE | ) | Re: ECF No. 4 |
| STATE OF PENNSYLVANIA; *and* | ) | |
| DISTRICT ATTORNEY OF MERCER | ) | |
| COUNTY, | ) | |
| | ) | |
| Respondents. | ) | |

**REPORT AND RECOMMENDATION**

**I.    RECOMMENDATION**

For the reasons that follow, it is respectfully recommended that the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (the "Petition"), ECF No. 4, be denied. It is further recommended that a certificate of appealability be denied.

**II.   REPORT**

Joshua L. Stewart ("Petitioner") is a state prisoner currently incarcerated at the State Correctional Institution at Huntingdon ("SCI-Huntingdon") in Huntingdon, Pennsylvania.

Petitioner initiated this action by submitting the Petition on April 9, 2021 without the required filing fee. ECF No. 1. Petitioner paid the filing fee on May 7, 2021, ECF No. 3, and the Petition was formally filed the same day, ECF No. 4.

In the Petition, Petitioner attacks his 2013 convictions in the Court of Common Pleas of Mercer County, Pennsylvania, for Murder of the First Degree, in violation of 18 Pa. C.S.A. § 2502(a), Murder of the Second Degree, in violation of 18 Pa. C.S.A. § 2502(b), two counts of Robbery, in violation of Pa. C.S.A. § 3702(a)(1)(i) and (ii), and two counts of Criminal

1

Conspiracy, in violation of 18 Pa. C.S.A. § 903(a)(1) and 18 Pa. C.S.A. § 3702(a)(1)(ii). See Com. v. Stewart, Docket No. CP-43-CR-122-2012 (C.C.P. Mercer Cnty.) (docket available at https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-43-CR-0000122-2012&dnh=fUztFJu706R5JcBNFjtl9g%3D%3D (last visited Sept. 4, 2024)). See also ECF No. 16-5 at 1-4

Petitioner initially was sentenced on September 26, 2013, to two concurrent life sentences – one for each murder conviction – as well as a concurrent aggregate sentence of 20-40 years of incarceration for the remaining convictions. ECF No. 16-5 at 1-4; ECF No. 16-23 at 1. However, as part of his proceedings in state court pursuant to the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa. C.S.A. §§ 9541-9546, his sentence was amended on August 22, 2019, to vacate the life sentence that he received for his second degree murder conviction, as it merged with the life sentence for his first degree murder conviction. ECF No. 16-22 at 1. His sentence as entered on September 26, 2013 "remain[ed] in full force and effect" in all other respects. Id.

### A. Factual Background and Procedural History

The following is a recitation of relevant factual background from the Pennsylvania Superior Court's opinion in Petitioner's PCRA appeal.

> The PCRA court summarized the facts of this case as follows:
>
> On December 30, 2011, [Stewart] decided[,] along with his co-conspirator [Devine Campbell ("Campbell"),] to rob the patrons and [the] bar known as the Basilone Bar and Restaurant [ ("Basilone's Bar") ] in [Farrell], Mercer County, Pennsylvania. They recruited [Tylor Kalenic ("Kalenic") ] by asking him to join them in "hitting a lick." These three young men had one weapon among them[,] which was a .22 caliber pistol that [was] always in the possession and control of [ ]Stewart.
>
> Basilone's [B]ar had a video surveillance system with two cameras[:] one on the outside showing the sidewalk and street area[,] and another on the inside showing the patrons of the bar and the cash register towards the front of the building. Throughout the

2

jury trial, the Commonwealth continuously played various portions of the surveillance video through different witnesses[,] who identified the people on the videos. All three defendants were depicted walking around the bar and past the bar on different occasions throughout the night. In fact, [Kalenic] was shown walking into the bar and pretending to order a pizza so that he could see how many patrons were inside and report back to his co-defendants. Eventually, [Kalenic] grew weary of the plot and decided to go home before any attempt to enter the bar and commit the robberies at gunpoint. He lived approximately seven houses north of the bar[,] along an alley that was adjacent to the bar.

[Kalenic] was a key Commonwealth witness[. Kalenic] was not charged with any offenses in exchange for his testimony[. Kalenic] testified that he watched from his kitchen window in the back of his house looking up the alley towards the bar and was able to see both [ ]Stewart and [ ]Campbell in the alley. Just moments prior[ ], the video surveillance showed [ ]Stewart putting on his mask and attempting to open the front door of the bar, but it was locked. [ ]Stewart and [ ]Campbell then walked into the alleyway next to the bar to decide what to do next.

[A few minutes later,] William Basilone [ ("Basilone") ], [the owner of] the bar, walked out the front door and along the front sidewalk to the edge of the alleyway[,] where he was confronted by [ ]Stewart[. Stewart then] shot and killed [Basilone]. [Kalenic] testified that he viewed this from his back window seven houses away and saw [ ]Campbell [and Stewart] run down the alley towards [Kalenic's] house[ ]. Both [Stewart and Campbell] arrived moments later at [ ]Kalenic's house and all three of them were picked up by two [young women] and driven away from the scene.

* * *

The Commonwealth also called as witnesses the two young women who were involved with [ ]Stewart and [ ]Campbell[. The women were in] contact [with Stewart and Campbell] by text messaging throughout the evening. Those text messages [were introduced by the Commonwealth as evidence to further establish the conspiracy charges].

After Stewart and Campbell were arrested and incarcerated[ ], they allegedly hatched a plot to have each of their brothers impregnate each of these women in the hopes that that would prevent [the women] from testifying at the trial or getting them to be alibi witnesses. In fact, both of these women did become pregnant after Stewart and Campbell were incarcerated through relationships they

3

had with [Stewart and Campbell's] respective brothers. However, neither of the women knew about any such plot.

[T]he Commonwealth relied [ ]on a jailhouse snitch, Cedric Boyd [ ("Boyd") ], who claimed to have verbal and written correspondence between himself and Stewart while they were in the Mercer County Jail describing this pregnancy plot and also making various admissions as to [Stewart's] culpability in these crimes. [ ]Boyd was called as a witness on behalf of the Commonwealth at [ ]Stewart's trial and testified that he had been [in prison] at SCI Albion for about 33 months awaiting trial on sexual assault and simple assault cases in Mercer County[. Boyd was] periodically transported back and forth from [SCI] Albion and [ ] the Mercer County Jail. [ ]Boyd conceded that he had spent about a quarter of his life [in prison,] and that he had a federal conviction for robbery about 20 years earlier as well as a retail theft conviction in 2008 and a federal detainer was pending for alleged probation violations based upon the new Mercer County charges. [ ]Boyd conceded that he is a jailhouse snitch and had cooperated with the government several times in the past.

[Boyd] testified that [ ]Stewart approached him in the Mercer County Jail for legal advice[,] and that over several months in 2012[,] prior to [Stewart]'s trial[,] they had various discussions about [Stewart's] case as well as written correspondence. [The Commonwealth introduced two letters purportedly exchanged between Boyd and Stewart.] Initially, [Stewart indicated] that [Kalenic] was the one who shot [Basilone] in the alley after their initial plot to rob the bar failed because of the locked front door. [Stewart] had told him [*sic*] that they needed money to take girls to a hotel. [Stewart] expressed to [Boyd] that he did not want to be a snitch and tell everybody that [Kalenic] had done the shooting and [Stewart] wanted advice[.]

For some reason, [Boyd] did not believe he was getting [the] full story, so he pressed [ ]Stewart that he could only help ... if he told [Boyd] the truth. Eventually, [ ]Stewart admitted that [Stewart was the one who had shot Basilone and that Kalenic had left before the shooting.] According to [Boyd], [Stewart] told him that when [ ]Basilone came out to the alley, [Stewart] demanded money from [Basilone] but was told [Basilone] had [no money. Stewart proceeded to shoot] Basilone in the chest and then kept shooting [before running] to [Kalenic]'s house after the shooting.

[ ]Boyd also claimed that [ ]Stewart told him that he and [ ]Campbell both had brothers who they requested to contact the [two women], romance them and get them pregnant so that the sisters could be used as alibi witnesses. Around October 2012, when [Boyd] was at the

4

Mercer County Jail, he further claims that [ ]Stewart told him that their brothers were successful and that both sisters were pregnant.

[Throughout] his testimony, [ ]Boyd conceded that he has been a long-time jailhouse snitch and that while he had no specific plea agreement in his pending Mercer County cases, [the District Attorney was going to] advise [Boyd's] judge of his cooperation in [the] murder trial. [Boyd] also received other minor benefits such as the county detective transporting his mother from Mercer County to SCI Albion to visit him. [ ]Boyd had also conceded that he had given various fake names in his past.

* * *

[The Commonwealth also called] Gary J. Thomas, Jr. [ ("Thomas") ], [who] testified that on December 30, 2011[,] he was on his way home from work and at about 11:30 to 11:40 p.m. he pulled into the parking lot of Razzcals bar in Farrell.... [Thomas] heard several pops that he thought were firecrackers coming from the area of Basilone's [B]ar[,] about a block away. [Thomas] looked down the street at Basilone's [B]ar and saw a white man walk out of the alley toward him[. The man stumbled] as though he [was] drunk[,] and then [Thomas] saw a person come up from behind [the man], raise his arm and shoot [the man] four times in the back. The white man then fell forward onto the sidewalk and his assailant stood over him and shot him three more times as he laid there. [Thomas testified that t]he gunman was a black male who was wearing a grey hooded sweatshirt with the hood up[.]

Karla Dunlevy [ ("Dunlevy") ] was also called as a witness for the Commonwealth and she testified that on December 30, 2011[,] between 11:30 and 11:40 p.m., she was in the kitchen of her second floor apartment[,] cattycorner from Basilone's [B]ar[,] making ham and bean soup[,] when she heard what she thought were firecrackers. She looked out and saw a pinkish/orangish glow off and on and then went on her back porch[, where she] could see the front of the bar [as well as] part of the alley. She saw a white person getting shot by a person with a hoodie shooting down on the other person. She was unable to determine the race or gender of the shooter.

Com. v. Stewart, No. 1454 WDA 2019, 2020 WL 4192457, at *1-3 (Pa. Super. Ct. July 21, 2020) (brackets as in the Superior Court's opinion).  See also Docket, Stewart, No. 1454 WDA 2019 (available at https://ujsportal.pacourts.us/Report/PacDocketSheet?docketNumber=1454%20WDA%202019&dnh=FcZ6GlooSuqoHQ2u7EP4Rw%3D%3D (last visited Sept. 4, 2024)).

5

Petitioner was convicted by a jury on September 17, 2013. ECF No. 16-4 at 1-2. He was sentenced on September 26, 2013. ECF No. 16-5 at 1-4.

Petitioner moved for, and was granted leave to file a notice of direct appeal *nunc pro tunc* on October 31, 2013. ECF Nos. 16-6 and 16-7. He timely filed a Notice of Appeal *nunc pro tunc* on November 6, 2013. ECF No. 16-8 at 1.

Petitioner's specific claims on direct appeal are not relevant to the present habeas petition. What is relevant is that the Superior Court ultimately affirmed his conviction and sentence on July 11, 2014. ECF No. 16-4 at 1. See also Docket, Com. v. Stewart, No. 171 WDA 2013 (Pa. Super. Ct.) (available at https://ujsportal.pacourts.us/Report/PacDocketSheet?docketNumber=1791%20WDA%202013&dnh=k%2BGPNUv%2FOz7ikqOxzo9dOQ%3D%3D (last visited Sept. 4, 2024)).

Petitioner timely sought leave to appeal from the Pennsylvania Supreme Court, but *allocatur* was denied on January 21, 2015. ECF No. 16-16. See also Docket, Com. v. Stewart, No. 365 WAL 2014, (Pa.) (available at https://ujsportal.pacourts.us/Report/PacDocketSheet?docketNumber=365%20WAL%202014&dnh=uBZusY51bSUAnqGli%2BJYpQ%3D%3D (last visited Sept. 4, 2024)).

There is no indication that Petitioner petitioned for a writ of *certiorari* from the United States Supreme Court. Therefore, his conviction became final on April 21, 2015 – when the period of time for doing so lapsed. U.S. Sup. Ct. R. 13.

Petitioner's *pro se* PCRA petition was received by the Court of Common Pleas of Mercer County on January 6, 2016. ECF No. 16-17 at 1 and 10. Counsel was appointed on January 11, 2016. ECF No. 16-18. Counsel filed multiple amended PCRA petitions throughout the proceeding, which appear to have built upon each other to at least some degree. ECF Nos. 16-19,

16-20, and 16-21.  The PCRA trial court held evidentiary hearings on June 1, 2018, December 5, 2018, and January 8, 2019.  ECF No. 16-23 at 2.

On August 22, 2019, the PCRA trial court issued an order granting relief as to Petitioner's two concurrent life sentences, as described above.  ECF No. 16-22.  It also issued a Memorandum Opinion and Order denying additional PCRA relief.  ECF No. 16-23 at 1 and 27.

Petitioner timely appealed to the Superior Court on September 23, 2019.  ECF No. 16-24 at 1.  Petitioner raised four claims on appeal, the following two of which are relevant to the present federal habeas petition.

> (1) Whether the [PCRA c]ourt erred in denying [Stewart]'s [PCRA] Petition issue alleging that trial counsel was ineffective for failing to properly impeach [the] Commonwealth's witness, [Kalenic], pertaining to his ability to see the crime scene from his house?
>
> (2) Whether the PCRA [c]ourt erred in denying [Stewart]'s PCRA [Petition] issue pertaining to trial counsel's failure to properly investigate the view of the crime scene from [the] Commonwealth's witness, [Kalenic]'s, kitchen window?

Stewart, 2020 WL 4192457, at *4.

On July 21, 2020, the Superior Court issued a decision addressing these claims together.  Initially, it opined that Petitioner had failed to develop these claims in his brief.  Id. at *5.  But it then went on to find that Petitioner's claims failed on the merits as well.  Id.

Petitioner timely sought leave to appeal to the Pennsylvania Supreme Court on August 18, 2020, but *allocatur* was denied on February 26, 2021.  ECF No. 16-33.  See also Docket, Com. v. Stewart, No. 256 WAL 2020 (Pa.) (available at https://ujsportal.pacourts.us/Report/PacDocket Sheet?docketNumber=256%20WAL%202020&dnh=YoJNP1Rm7fVkU%2FCjXrQLJQ%3D%3 D (last visited Sept. 4, 2024)).

7

B. **Federal Habeas Petition**

Petitioner initiated this federal habeas action April 5, 2021 by placing the Petition in the prison mailing system. ECF No. 4 at 14. Petitioner asserts the following single ground for relief.

Ground One: Failure of trial counsel to investigate and impeach only witness to identify Petitioner.

> (a) Supporting facts[:] Taylor Kalenic was the only witness to both witness the crime and identify Petitioner as the shooter. Said witness testified that he seen the crime from his kitchen window located at the back of his house. The window in question was not facing the scene of the crime. It would make viewing the crime scene impossible. At trial the commonwealth took pictures outside the window facing the crime scene, several houses up and counsel took that view despite Petitioner's insistence that the view was false.

Id. at 5.

Respondents answered the Petition on November 12, 2021, ECF No. 16, and submitted a supplement to the record on November 23, 2021, ECF No. 19. Petitioner submitted a Traverse on December 28, 2021. ECF No. 21.

The Petition is ripe for consideration.

C. **Procedural Issues**

Before this Court addresses the merits of Petitioner's federal habeas claims, it will address whether the Petition fulfills the applicable procedural requirements, as set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").

1. **The AEDPA statute of limitations**

The first consideration in reviewing a federal habeas corpus petition is whether the petition was timely filed within the applicable statute of limitations. In 1996, Congress enacted the AEDPA, which generally established a strict one-year statute of limitations for the filing habeas petitions pursuant to 28 U.S.C. § 2254. The applicable portion of the statute is as follows:

8

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> >
> > (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> >
> > (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

The United States Court of Appeals for the Third Circuit has held that the statute of limitations set out in Section 2244(d) must be applied on a claim-by-claim basis. Fielder v. Varner, 379 F.3d 113, 122 (3d Cir. 2004), cert. denied sub nom. Fielder v. Lavan, 543 U.S. 1067 (2005). Thus, in analyzing whether a petition for writ habeas corpus has been timely filed under the one-year limitations period, a federal court must undertake a three-part inquiry. First, the court must determine the "trigger" date for the individual claims raised in the petition. Typically, this is the date that the petitioner's direct review concluded and the judgment became "final" for purposes of triggering the one-year period under Section 2244(d)(1)(A). Second, the court must determine

9

whether any "properly filed" applications for post-conviction or collateral relief were pending during the limitations period that would toll the statute pursuant to Section 2244(d)(2). Third, the court must determine whether any of the other statutory exceptions or equitable tolling should be applied on the facts presented. See, e.g., Munchinski v. Wilson, 807 F. Supp. 2d 242, 263 (W.D. Pa. 2011), aff'd, 694 F.3d 308 (3d Cir. 2012) (citing Nara v. Frank, No. 99-5, 2004 WL 825858, at *3 (W.D. Pa., Mar. 10, 2004)).

In the instant case, Respondents concede that the Petition is timely filed. ECF No. 16 at 11 and n.7. Here, Petitioner's conviction became final on April 21, 2015, and the AEDPA clock was tolled with the filing of the *pro se* PCRA no later than January 6, 2016. The clock began to run again with the denial of *allocatur* on February 26, 2021, and stopped again with the constructive filing of the Petition on April 5, 2021. This is a total of 298 days – less than one year. Therefore, this Court concludes that the Petition is timely.

### 2. Exhaustion and procedural default

The provisions of the federal habeas corpus statute at 28 U.S.C. § 2254(b) require a state prisoner to exhaust available state court remedies before seeking federal habeas corpus relief. In order to exhaust a claim, "a petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." McCandless v. Vaughn, 172 F.3d 255, 260-61 (3d Cir. 1999).

A federal court may be precluded from reviewing habeas claims under the "procedural default doctrine." Gray v. Netherland, 518 U.S. 152, 162 (1996); Coleman v. Thompson, 501 U.S. 722, 732 (1991); Doctor v. Walters, 96 F.3d 675, 678 (3d Cir. 1996) (abrogated on other grounds by Beard v. Kindler, 558 U.S. 53, 60-61 (2009)); Sistrunk v. Vaughn, 96 F.3d 666, 675 (3d Cir. 1996). This doctrine is applicable where, *inter alia*, a petitioner's claims are "deemed exhausted

because of a state procedural bar[.]" Lines v. Larkin, 208 F.3d 153, 160 (3d Cir. 2000). Like the exhaustion requirement, the procedural default doctrine was developed to promote our dual judicial system and, in turn, it is based upon the "independent and adequate state law grounds" doctrine, which dictates that federal courts will not review a state court decision involving a question of federal law if the state court decision is based on state law that is "independent" of the federal question and "adequate" to support the judgment. Coleman, 501 U.S. at 750. The PCRA's one-year statute of limitations has been held to be an "independent and adequate" state law ground for denying habeas relief. Whitney v. Horn, 280 F.3d 240, 251 (3d Cir. 2002).

Respondents concede that Petitioner's sole claim was exhausted. ECF No. 16 at 13. This Court agrees. Further, the record supports the conclusion that the sole ground for relief is not defaulted, as it appears to be a combination of claims 1 and 2 as they were presented to the Superior Court. See Stewart, 2020 WL 4192457, at *4-5 (addressing Petitioner's claims on the merits).

### D. Analysis of the Merits of Petitioner's Claim

#### 1. Standard of review

Where the state court has reviewed a federal issue presented to them and disposed of the issue on the merits, and that issue is also raised in a federal habeas petition, the AEDPA provides the applicable deferential standards by which the federal habeas court is to review the state court's disposition of that issue. See 28 U.S.C. § 2254(d) and (e).

In Williams v. Taylor, 529 U.S. 362 (2000), the United States Supreme Court expounded upon the standard found in 28 U.S.C. § 2254(d). The Supreme Court explained that Congress intended that habeas relief for errors of law may only be granted in two situations: 1) where the state court decision was "contrary to . . . clearly established Federal law as determined by the Supreme Court of the United States" or 2) where that state court decision "involved an

unreasonable application of[] clearly established Federal law as determined by the Supreme Court of the United States." Id. at 404-05 (emphasis deleted).

A state court decision can be contrary to clearly established federal law in one of two ways. First, the state courts could apply a wrong rule of law that is different from the rule of law required by the United States Supreme Court. Second, the state courts can apply the correct rule of law but reach an outcome that is different from a case decided by the United States Supreme Court where the facts are indistinguishable between the state court case and the United States Supreme Court case. Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004) (quoting Williams, 529 U.S. at 405-06).

In addition, the United States Court of Appeals for the Third Circuit has explained that "Circuit precedent cannot create or refine clearly established Supreme Court law, and lower federal courts 'may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to [the Supreme] Court, be accepted as correct.'" Dennis v. Sec., Pa. Dep't of Corrs., 834 F.3d 263, 368 (3d Cir. 2016) (quoting Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (per curiam)). As the Supreme Court has further explained: "[s]ection 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." White v. Woodall, 572 U.S. 415, 428 (2014).

The AEDPA also permits federal habeas relief where the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

12

Specific factual determinations by the state court that are subsidiary to the ultimate decision to grant post-conviction relief are subject to the presumption of correctness, and must be overcome by a petitioner by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). See also Lambert, 387 F.3d at 235-236. The Third Circuit has declined to adopt a "rigid approach to habeas review of state fact-finding." Id. at 236 n.19. If a state trial court and appellate court make conflicting factual findings, the habeas court must defer to the findings of the higher court – regardless of the propriety of those findings under state law – unless they are rebutted by clear and convincing evidence. See Rolan v. Vaughn, 445 F.3d 671, 680 (3d Cir. 2006).

It is a habeas petitioner's burden to show that the state court's decision was contrary to or an unreasonable application of United States Supreme Court precedent and/or an unreasonable determination of the facts. Ross v. Atty. Gen. of State of Pennsylvania, No. 07-97, 2008 WL 203361, at *5 (W.D. Pa. Jan. 23, 2008). This burden means that Petitioner must point to specific case law decided by the United States Supreme Court and show how the state court decision was contrary to or an unreasonable application of such United States Supreme Court decisions. Owsley v. Bowersox, 234 F.3d 1055, 1057 (8th Cir. 2000) ("To obtain habeas relief, Mr. Owsley must therefore be able to point to a Supreme Court precedent that he thinks the Missouri state courts acted contrary to or unreasonably applied. We find that he has not met this burden in this appeal. Mr. Owsley's claims must be rejected because he cannot provide us with any Supreme Court opinion justifying his position."); West v. Foster, No. 07-CV-00021, 2010 WL 3636164, at *10 n.20 (D. Nev. Sept. 9, 2010) ("petitioner's burden under the AEDPA is to demonstrate that the decision of the Supreme Court of Nevada rejecting her claim 'was contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States.*' 28 U.S.C. § 2254(d)(1) (emphasis added). Petitioner has not even begun to

13

shoulder this burden with citation to apposite United States Supreme Court authority."), aff'd, 454 F. App'x 630 (9th Cir. 2011).

To the extent that a claim was fairly presented to the state courts but was not addressed on the merits, *de novo* review applies. Cone v. Bell, 556 U.S. 449, 472 (2009). The same review applies to a claim that resulted from a state court decision that was contrary to or an unreasonable application of United States Supreme Court precedent and/or an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1) and (2).

Here, the Superior Court ruled on the merits of Petitioner's underlying claims in his PCRA appeal. Stewart, 2020 WL 4192457, at *4-5. Therefore, AEDPA deference applies.

### 2. The right to effective assistance of counsel

Petitioner's sole ground for relief is that his trial counsel was ineffective for failing to investigate and impeach Kalenic's testimony at trial that he was able to view, from his back kitchen window, Petitioner murder the victim. ECF No. 4 at 5. Thus, the "clearly established Federal law" at issue in this habeas proceeding is the effective assistance of counsel standard set forth in Strickland v. Washington, 466 U.S. 668, (1984).

The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (quoting Strickland, 466 U.S. at 684). The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance: (1) counsel's performance was unreasonable; and (2) counsel's unreasonable performance actually prejudiced the defense. Strickland, 466 U.S. at 687. To determine whether counsel performed below the level expected from a reasonably competent attorney, it is necessary to judge counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct. Id. at 690.

The first prong of the Strickland test requires a petitioner to establish that his or her attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. at 688. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy." Id. at 689. The question is not whether the defense was free from errors of judgment, but whether counsel exercised the customary skill and knowledge that normally prevailed at the time and place. Id. Instead, Petitioner is required to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Harrington v. Richter, 562 U.S. 86, 104 (2001) (quoting Strickland, 466 U.S. at 687).

The second prong of Strickland requires a petitioner to demonstrate that counsel's errors deprived him of a fair trial and the result was unfair or unreliable. Strickland, 466 U.S. at 689. To prove prejudice, a petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 694. A "reasonable probability" is one that is sufficient to undermine confidence in the outcome. Id.

In considering a claim of ineffectiveness of counsel, Pennsylvania uses a three-part effectiveness test.

> To plead and prove ineffective assistance of counsel a petitioner must establish: "(1) that the underlying issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice resulted from counsel's act or failure to act." Commonwealth v. Stewart, 84 A.3d 701, 706 (Pa. Super. 2013) (*en banc*). The failure to meet any of these aspects of the ineffectiveness test results in the claim failing. Id.

Future v. Ferguson, No. 16-2346, 2022 WL 2307095, at *8 (M.D. Pa. June 27, 2022), certificate of appealability denied sub nom. Future v. Sup't Benner Twp. SCI, No. 22-2419, 2022 WL 18536146, at *1 (3d Cir. Dec. 6, 2022). The United States Court of Appeals for the Third Circuit has found this test not to be contrary to Strickland. Werts v. Vaughn, 228 F.3d 178, 204 (3d Cir. 2000).

Here, the Superior Court applied Pennsylvania's three-part test to Petitioner's claim of ineffective assistance of counsel in his PCRA appeal. Stewart, 2020 WL 4192457, at *4. Accordingly, the Superior Court's analysis was not contrary to Strickland.

In its opinion affirming the denial of Petitioner's corresponding PCRA claim, the Superior Court set forth the following.

> In his brief, Stewart addresses his first two claims together. Stewart claims that his trial counsel, James Goodwin, Esq. ("Attorney Goodwin"), was ineffective for failing to cross-examine Kalenic about his view of the shooting. Brief for Appellant at 7. Stewart alleges that Kalenic would not have been able to see the shooting from his kitchen window. *Id.* Further, Stewart argues that Attorney Goodwin was ineffective for failing to investigate Kalenic's view from his kitchen window. *Id.* Stewart contends that Kalenic's view was obstructed and that Kalenic would not have been able to see the shooting from his kitchen. *Id.* at 8. Additionally, Stewart points to the testimony of John Jarrett Kennedy Whalen, Esq. ("Attorney Whalen"), who represented Campbell at Campbell's trial, that his team took photos from the outside of Kalenic's kitchen window in the direction of the scene. *Id.* Stewart claims that the photographs taken by Attorney Whalen's team were "vastly different" from the photographs presented by the Commonwealth at Stewart's trial and, thus, Attorney Goodwin was ineffective. *Id.*[3]
>
> [3] At the final PCRA hearing, Attorney Whalen testified that his team investigated and took pictures from Kalenic's kitchen window towards the crime scene. N.T. (PCRA Evidentiary Hearing), 1/8/19, at 3, 5-6. Contrary to Stewart's assertion, Attorney Whalen stated that the Commonwealth's photographs were "from a lower vantage point" than Attorney Whalen's, but were ultimately very similar. *Id.* at 6-11.

Id. at *5 and n.3.

16

The Superior Court concluded that Petitioner had failed to demonstrate prejudice based on trial counsel's allegedly deficient performance.

> Moreover, as the PCRA court notes, there was more than ample evidence presented at trial to corroborate Kalenic's testimony regarding his view of the shooting. *See* PCRA Court Memorandum Order and Opinion, 8/22/19, at 10-15. Additionally, in rejecting these claims, the PCRA court found that Kalenic's testimony of what occurred in the alley is consistent "with the physical evidence discovered in the alley after the shooting,[ ]the testimony of [Thomas,]" and the multitude of photographs presented by the Commonwealth. *Id.* at 11. The Commonwealth's photographs depicted not only Kalenic's view from his kitchen, but also a clear view from the scene to Kalenic's kitchen window. *Id.* at 11; *see also* N.T. (PCRA Evidentiary Hearing), 12/5/18, at 10, 30. The Commonwealth further introduced photographs showing that there "are no trees or bushes in the backyards of those homes that would obstruct [Kalenic's] view." *See* PCRA Court Memorandum Order and Opinion, 8/22/19, at 11; *see also* N.T. (PCRA Evidentiary Hearing), 12/5/18, at 30.
>
> Thus, the record reveals that the physical evidence presented at trial confirmed Kalenic had a clear view of the scene.[4] Based upon the foregoing, Stewart has failed to demonstrate that there was a reasonable probability that the outcome of Stewart's trial would have been different. *See King, supra; see also Ali, supra; Holt, supra*. Accordingly, as Stewart failed to establish that he was prejudiced by counsel's alleged failures, he is not entitled to relief on these two claims.
>
> [4] We observe that the testimony from other witnesses confirmed Kalenic's testimony regarding the shooting. At trial, the Commonwealth presented the testimony of Thomas and Dunlevy, who both testified that they heard a sound of "firecrackers" and saw a white man getting shot by a person in a grey hoodie outside of Basilone's Bar. *See* N.T. (Jury Trial), 9/12/13, at 91, 95-96, 105-110; *see also* PCRA Court Memorandum Order and Opinion, 8/22/19, at 8-9.

Id. at *5 and n.4.

A review of the record indicates that this conclusion was neither contrary to, or an unreasonable application of Strickland, nor based on an unreasonable factual determination. The testimony of the witnesses support that conclusion that, while the prosecution's photographs were

17

taken outside of Kalenic's kitchen window, they accurately depicted the view that Kalenic would have had on the night of the murder. See, e.g., PCRA Hr'g Tr. dated Jan. 8, 2019, at 6-11 (testimony of co-defendant's attorney John Whalen, indicating that he and his co-counsel examined the view from Kalenic's window from outside the house, and that the prosecution's photo of the view was similar to his own.). This included the mouth of the alley as it opened up to the street where the bar's main entrance was located. See Com. Exhibit No. 283 (included in the paper state court record). Trial testimony and photos from the murder scene indicate that Kalenic's view from his kitchen window would have included the scene of the shooting. See, e.g., Trial Tr. dated Sept. 13, 2013, at 121-22 (witness testimony describing placement of the body, including that his feet were "at the alley"). Id. at 126-34 (describing the placement of the victim's body and shell casings found at the scene of the murder).

Additionally, the PCRA trial court's opinion noted that some exhibits showed bright lights illuminating the side of the bar, and which would have illuminated the alleyway. ECF No. 16-23 at 13. Trial and PCRA testimony further supported the conclusion that, although the murder took place at night, the mouth of the alley where the shooting occurred was sufficiently well-lit for Kalenic to see the murder. PCRA Hr'g Tr. dated Dec. 5, 2018, at 77 (agreeing that crime scene was "relatively visible due to artificial lighting" at night "most of the time."). See also Trial Tr. dated Sept. 12, 2013, at 111 (witness testimony indicating that there was "a light at the top [of the alley]" and describing watching the shooter run down the alley "from light to dark").

Finally, this Court acknowledges Petitioner's arguments in his Traverse, which generally include that it would have been impossible to see the crime scene from Kalenic's window, and that it was too dark to see the scene of the shooting. ECF No. 21 at 2. But these arguments are not evidence, and are insufficient to demonstrate that the PCRA court's decision was based on an

unreasonable determination of facts, or to overcome the presumption of correctness afforded the PCRA court's subsidiary factual findings. 28 U.S.C. § 2254(d)(2) and (e)(1). Further, to the extent that Petitioner asserts that he had looked through Kalenic's window many times himself, and "has video footage from said window that proves it is physically impossible to see the crime scene[,]" ECF No. 21 at 2, he does not indicate where that evidence is in the state court record, and this Court was unable to locate it in its independent review.

This Court's analysis under 28 U.S.C. §§ 2254(d)(1) and (d)(2) of a claim that was addressed on the merits is limited to the state court record. 28 U.S.C § 2254(d)(2) (inquiry into whether a state court decision on the merits was based on an unreasonable determination of the facts is made "in light of the evidence presented in the State court proceeding."). See also Cullen v. Pinholster, 563 U.S. 170, 181 (2011) ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). Further, Petitioner has not made any showing to allow this Court to consider additional evidence under 28 U.S.C. § 2254(e)(2).

Thus, Petitioner has failed to meet his burden under Section 2254(d)(1) and (d)(2) because he has not demonstrated that the Superior Court's determination that Petitioner suffered no prejudice due to trial counsel's failure to investigate or impeach Kalenic's testimony was contrary to, or an unreasonable application of Strickland, or an unreasonable determination of the facts. The Petition should be denied.

### E. Certificate of Appealability

A certificate of appealability should be denied, as jurists of reason would not debate that Petitioner has failed to show entitlement to relief. See Slack v. McDaniel, 529 U.S. 473, 484-85 (2000).

### III. CONCLUSION

For the reasons set forth above, it is respectfully recommended that the Petition, ECF No. 4, be denied. It is further recommended that a certificate of appealability be denied.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1), and Local Rule 72.D.2, the parties are permitted to file written objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Objections are to be submitted to the Clerk of Court, United States District Court, 700 Grant Street, Room 3110, Pittsburgh, PA 15219. Failure to timely file objections will waive the right to appeal. Brightwell v. Lehman, 637 F.3d 187, 193 n. 7 (3d Cir. 2011). Any party opposing objections may file their response to the objections within fourteen (14) days thereafter in accordance with Local Civil Rule 72.D.2.

Dated: September 4, 2024

Respectfully submitted,

MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

cc:   Hon. William S. Stickman
      United States District Judge

      Joshua L. Stewart
      LH5944
      SCI Huntingdon
      1100 Pike Street
      Huntingdon, PA 16654-1112

      All counsel of record (*via* CM/ECF)